## APPEAL OF THE TOPEKA TENT & AWNING CO.

Docket No. 3440.  Submitted July 17, 1925.  Decided January 30, 1926.

1. One of four partners purchased the nineteen-thirtieths interest held by two partners, paying therefor an amount in excess of nineteen-thirtieths of the book value of the tangible assets of the partnership. *Held*, that the amount paid in excess of nineteen-thirtieths of the book value does not accurately measure nineteen-thirtieths of the value of certain rights in a patent owned by the partnership plus a one-half interest in certain rights in a Canadian patent owned by one of the vendor partners.

2. A stockholder of a corporation owning 1,435 out of 1,500 shares of stock outstanding and entitled to receive royalties from the corporation upon a certain patent owned by him, waived in 1918 his rights to receive further royalties. *Held*, that the value of the right so waived may not be included in the computation of invested capital.

*Harry W. Colmery* and *George Elliott, Esqs.*, for the taxpayer.
*Benjamin H. Saunders, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of a deficiency in income and profits tax for the year 1919 in the amount of $2,976.69. The appeal is based upon seven allegations of error on the part of the Commissioner in determining the deficiency.

### FINDINGS OF FACT.

The Topeka Tent & Awning Co. was originally organized as a partnership in 1901. It first had three partners; later four. On November 1, 1917, the members of the partnership were William Schick, owning a nine-thirtieths interest; B. W. Carter, owning a ten-thirtieths interest; F. A. Anton, owning a ten-thirtieths interest, and J. G. Stoneback, owning a one-thirtieth interest.

On March 7, 1911, a patent was issued to F. A. Anton on a lateral arm for awnings and, on November 30, 1912, Anton entered into a contract with the partnership reading in part as follows:

For a valuable consideration and $1.00 in hand paid by the party of the second part [The Topeka Tent & Awning Company] to the party of the first part [F. A. Anton], the receipt of which is hereby acknowledged, and for the consideration mentioned in other paragraphs herein, the party of the first part hereby grants and sells to the party of the second part, their heirs and assigns, the rights and privileges pertaining to said patent as named hereafter, namely, the exclusive right to manufacture and market said articles in the United States and territories thereof, said article being covered under patent No. 986,120, and known as Anton's Lateral Arm.

The party of the second part agrees to pay to the party of the first part, his heirs and assigns, a royalty of fifty cents for each arm manufactured and sold previous to this time and during the life of said patent, except as hereinafter provided.

The party of the second part shall have the privilege to manufacture, use and sell Anton's Lateral Arms to the extent of equipping awnings which may be manufactured and sold by them without paying any royalty for arms so used and sold, it being also understood that all Anton's Lateral Arms so manufactured, used and sold previous to this time to come under this provision.

A royalty of fifty cents per arm is to be paid in each and every case when only the arms are sold, the party of the first part, however, agrees herewith to refund such royalties received from the party of the second part on any accounts of sales of Anton's Lateral Arms terminating in lost accounts.

On November 8, 1917, the partnership was dissolved. F. A. Anton purchased the nine-thirtieths interest of William Schick in the partnership for $31,500 and the ten-thirtieths interest of B. W. Carter in the partnership and his one-half interest in certain rights in Canadian patent No. 142,263, dated August 13, 1912 (the Canadian patent on Anton lateral arms), for $40,000. As a part of the consideration for the payment of $31,500 to him, Schick agreed "not to engage in the manufacture and sale of tents and awnings, or other articles which are usually manufactured and sold by tent and awning companies (except such articles and lines of business as the undersigned is now engaged in) in Shawnee County, Kansas, for the period of five years from this date." As a part of the consideration of $40,000 paid to Carter, he agreed "not to engage in the manufacture and sale of tents and awnings, or other articles which are usually manufactured and sold by tent and awning companies, in Shawnee County, Kansas, for a period of five years from this date." These transactions resulted in a new partnership with F. A. Anton owning a twenty-nine-thirtieths interest and J. G. Stoneback a one-thirtieth interest. In addition, Anton agreed to assume all liabilities of the partnership, including the 1917 excess-profits tax, which amounted to $7,746. This partnership acquired the rights of the predecessor partnership in respect of the United States patent on Anton lateral arms and also acquired the one-half interest in the rights in the Canadian patent theretofore owned by B. W. Carter as an individual.

The taxpayer was incorporated on March 15, 1918, retaining the same name, The Topeka Tent & Awning Co., which had been used by the partnership prior to 1918. It was agreed that the corporate organization was to begin as of January 1, 1918. The taxpayer has elected to be taxed as a corporation for the entire calendar year 1918. At January 1, 1918, the partnership books showed tangible assets of $58,553.92. The opening balance sheet of the corporation was as follows:

| 1918 | Assets | | 1918 | Liabilities | |
|---|---|---|---|---|---|
| Jan. 1. | Merchandise | $40, 054. 81 | Jan. 1. | Capital stock | $150, 000. 00 |
| | Merchandise and tools | 516. 89 | | Surplus | 8, 553. 92 |
| | Furniture and fixtures | 336. 90 | | | |
| | Truck | 410. 00 | | | |
| | Accounts receivable | 14, 159. 13 | | | |
| | Insurance prepaid | 72. 10 | | | |
| | Gates and patterns | 1, 312. 50 | | | |
| | Cash | 1, 691. 59 | | | |
| | Patents | 75, 000. 00 | | | |
| | Royalty | 25, 000. 00 | | | |
| | | 158, 553. 92 | | | 158, 553. 92 |

The intangible assets included good will and the rights of the predecessor partnership (composed of Anton and Stoneback) in the United States and Canadian patents on Anton lateral arms.

The capital stock of the corporation was divided into $50,000 par value common stock and $100,000 par value preferred stock. Of this amount $143,500 was issued to F. A. Anton, $5,000 to J. G. Stoneback, and the remainder, $1,500, in equal shares to three other persons to conform with the State laws, which required at least five incorporators and directors.

On the organization of the corporation the stockholders desired to retire the preferred stock at the rate of $10,000 per year. In order that the corporation might have earnings sufficient to accomplish such purpose, Anton, who was the principal stockholder, decided to relieve the taxpayer from payment to him of the 50 cents royalty on each Anton lateral arm sold. At a meeting of the board of directors of the corporation held April 8, 1918, the following resolution was adopted:

On call of the president, F. A. Anton, the Board of Directors of the Topeka Tent and Awning Company met at the office of the company, 304 Kansas Avenue, Topeka, Kansas, on the above date. Directors present were: F. A. Anton, Fred. L. Ackerman, Jr., John G. Stoneback and Earl Akers.

President Anton reported that he met Revenue Officer H. M. Breidenthal of the Wichita Internal Revenue Department who so kindly assisted us and advised us in the reorganization and incorporation, and that he had quite a visit with him in the bank. The conversation had with Mr. Breidenthal convinced President Anton that apparently it was an impossibility to find anybody that could give positive information pertaining to the late laws passed affecting reorganization, and the laws passed were such puzzles that no one could give a positive. interpretation of the laws, since the interpretation of some of these laws might seriously interfere* with the plans made previously and decided upon. President Anton explained at length some of the problems that might confront us in the future, and to assist the corporation in carrying out the plans agreed on at and before the incorporation and recorded in minutes of the stockholders meeting March 20th, 1918. We made some generous offers.

Directors Aker's move which was seconded by Director Ackerman, Jr., and carried unanimously.

" Be it resolved that whereas it appears that it may not be permissible by law to set up invested capital for the intangible for the purpose of depreciation of the intangible in keeping with the value and depreciation of the intangible thus providing the means of retirement of the preferred stock as planned and,

" Whereas it is advisable to carry out the original plans of providing means for the retirement of the preferred stock and,

" Whereas laws with which no one seems to be familiar might prevent the setting up of invested capital or sufficient invested capital for the purpose of depreciation it is hereby,

" *Resolved that the Directors of the Topeka Tent and Awning Company accept the offer of F. A. Anton to waive his Royalty Rights on United States Anton Lateral Patents*, and his half interest in Royalty Rights on Canada Anton Lateral Patents, and on account of reorganization and incorporation being made March 15 as of January 1, 1918 refund to the Topeka Tent and Awning Company the Royalty received by him from them for the months of January, February, March and April amounting to $1,054.50, *providing, however, that this waiver and refund shall not be construed as a transfer for profit to him*, and further providing that this waiver is granted and this refund is made for the sole purpose of enabling the Topeka Tent and Awning Company to set up a valuation in harmony with the value of this intangible of the waiver and the refund made by him in cash for the purpose mentioned heretofore and for the further purpose of the depreciation to provide means for the retirement of the preferred stock *and futher providing that if it should be found later impossible to carry out this provision because it is not permissible by law, then this waiver and this refund shall be null and void for the reason that the consideration has failed*, and further providing that in case of such failure all Royalty paid to F. A. Anton for the months of January, February, March and April 1918 amounting to $1,054.50 and refunded to Topeka Tent and Awning Company as well as all Royalty that would be due F. A. Anton from the Topeka Tent and Awning Company, had no Waiver of paying royalty been granted and no refund been made shall at once become due and owing to him together with interest at 6 per cent per annum until paid and be it further provided that the Topeka Tent and Awning Company shall keep accurate accounts of all Arms manufactured and sold as provided in the original Royalty Contract by the Topeka Tent and Awning Company, a co-partnership and F. A. Anton for the purpose of assisting to establish a value of the intangible of the Royalty Contract for depreciation purposes, or in case the waiver of the Royalty Contract and the refunding heretofore mentioned for the reason stated has become inoperative, then the Records kept by Topeka Tent and Awning Company on all Arms manufactured and sold under the old Royalty Contract can be easily ascertained and settlement for moneys owing F. A. Anton together with interests be made and paid in full." (Italics ours).

Pursuant to this resolution, Anton refunded to the corporation $1,054.50 royalties which had been paid him upon Anton lateral arms sold by the taxpayer during the months of January, February, March, and April. On and after April 8, 1918, the taxpayer became possessed of the rights of the predecessor partnership in the United States and Canadian patents on Anton lateral arms and was also relieved from the payment of any royalties to Anton in respect of them. However, Anton still owned a one-half interest in the so-called shop rights of the Canadian patent. For this interest Anton

was paid $2,500 by the taxpayer on May 9, 1918. From the last-named date the taxpayer had the exclusive rights in the manufacture and sale of Anton lateral arms without the payment of any royalty under both the United States and Canadian patents.

From April 8, 1918, to the close of the year 1924, no credits were placed on the books of the taxpayer corporation showing any liability to Anton for royalties but accounts were kept to record the number of Anton lateral arms sold. No royalties were paid to Anton by the corporation until the close of the year 1924, when the Commissioner decided that the taxpayer was not entitled to any invested capital in respect of the value of the right to receive a royalty relinquished by the resolution of the board of directors dated April 8, 1918, quoted above.

The taxpayer is, and during the year 1919 and for many years prior thereto was, a manufacturer of tents, awnings, canvas products, automobile tops, and articles made out of fabrics; also a manufacturer of camp furniture and the Anton lateral arm. One of the most important assets of the taxpayer was its patent license to manufacture and sell Anton lateral arms. The Anton patent is a basic one and the taxpayer's competitors in the awning business must purchase lateral arms from it. The number of such arms sold from 1911 to 1919, inclusive, was as follows:

| | | | |
|---|---|---|---|
| 1911 | 2,427 | 1916 | 8,066 |
| 1912 | 3,696 | 1917 | 7,181 |
| 1913 | 5,724 | 1918 | 4,483 |
| 1914 | 4,778 | 1919 | 7,130 |
| 1915 | 5,314 | | |

The Anton lateral arm represents the largest single item of sale of the taxpayer at the present time, and in 1917 it represented around 50 per cent of the volume of the business. The following table shows gross sales of the taxpayer and its predecessor, the number of Anton lateral arms sold, the gross sales of arms, and the gross sales less arm sales:

| Year | Gross sales | Number of arms sold | Gross sales arms | Gross sales less arm sales |
|---|---|---|---|---|
| 1909 | $45,774.86 | None. | | $45,774.86 |
| 1910 | 57,777.09 | 1,296 | $6,510.91 | 51,266.18 |
| 1911 | 58,376.49 | 2,427 | 11,460.35 | 46,916.14 |
| 1912 | 63,956.02 | 3,696 | 20,194.62 | 43,761.40 |
| 1913 | 73,670.15 | 5,724 | 26,670.15 | 47,000.00 |
| 1914 | 65,289.25 | 4,778 | 21,763.68 | 43,525.57 |
| 1915 | 72,252.98 | 5,314 | 23,918.11 | 48,334.87 |
| 1916 | 93,336.34 | 8,066 | 35,993.69 | 57,342.65 |
| 1917 | 109,065.73 | 7,181 | 38,534.65 | 70,531.08 |
| 1918 | 95,510.04 | 4,483 | 25,870.74 | 69,639.30 |
| 1919 | 133,443.64 | 7,130 | 43,929.47 | 89,514.17 |
| 1920 | 218,574.46 | 10,270 | 74,459.85 | 144,114.61 |
| 1921 | 210,766.18 | 7,469 | 55,405.11 | 155,361.07 |
| 1922 | 249,867.15 | 10,407 | 72,253.26 | 177,613.89 |
| 1923 | 309,863.88 | 13,233 | 96,108.28 | 213,755.60 |
| 1924 | 346,929.12 | 12,365 | 102,878.92 | 244,050.20 |

The net profits for the calendar years 1908 to 1924, inclusive, and the net value of the tangible assets from 1909 to 1917, inclusive, are shown by the following:

| Year | Profits | Net tangibles | Year | Profits | Net tangibles |
|------|---------|---------------|------|---------|---------------|
| 1908 | $2,938.04 | | 1917 | $25,484.79 | $52,093.28 |
| 1909 | 9,644.64 | $15,377.36 | 1918 | 4,804.55 | |
| 1910 | 9,794.36 | 25,022.00 | 1919 | 28,032.22 | |
| 1911 | 6,006.62 | 32,866.36 | 1920 | 22,940.70 | |
| 1912 | 14,370.85 | 27,972.98 | 1921 | 13,766.53 | |
| 1913 | 17,857.68 | 31,943.83 | 1922 | 31,087.90 | |
| 1914 | 6,708.60 | 41,000.00 | 1923 | 35,316.18 | |
| 1915 | 18,010.79 | 38,708.60 | 1924 | 11,121.49 | |
| 1916 | 28,373.89 | 43,219.39 | | | |

## DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 10 days' notice, in accordance with Rule 50.

## OPINION.

SMITH: The questions involved in this appeal are: (1) The amount of invested capital to be allowed on certain intangible assets of a partnership paid in to the taxpayer corporation for shares of its capital stock; (2) the amount which may be included in invested capital representing the value of certain intangible assets, consisting of rights to receive royalties donated to the corporation by one F. A. Anton; (3) the amount to be deducted from gross income for exhaustion of intangibles; and (4) the right of the taxpayer to special consideration under section 328 of the Revenue Act of 1918.

1. Of the intangible assets paid in to the corporation as of January 1, 1918, by the partnership composed of Anton and Stoneback, the Commissioner has allowed invested capital as follows:

For nine-thirtieths of the partnership intangibles purchased by Anton from Schick_____ $15,741.50
For ten-thirtieths of the partnership intangibles purchased by Anton from Carter_____ 17,490.55
                                                                        ——————— $33,232.05
For one-half interest in shop right and royalty in Canadian lateral arm patent purchased by Anton from Carter_____ 5,000.00
                                                                        ———————
                                                                        38,232.05
Twenty-five per cent of stock outstanding_____ 35,000.00

The taxpayer contends that by this computation the Commissioner has not allowed the inclusion in invested capital of any amount representing Stoneback's one-thirtieth interest and Anton's ten-thirtieths interest in the partnership intangibles; in other words,

that the Commissioner has allowed for partnership intangibles only nineteen-thirtieths of the amount that should be allowed, and that the taxpayer is entitled to include in invested capital the value of the eleven-thirtieths interest in the intangibles paid in to the taxpayer corporation for shares of stock by Anton and Stoneback.

The evidence in this appeal shows that Anton acquired Schick's and Carter's interests in the old partnership, which was dissolved on November 8, 1917, at a cost in excess of their pro rata shares of the book value of the tangibles of the partnership. The book value of the tangibles of the partnership at January 1, 1918, was $58,553.92. The value was substantially the same at November 8, 1917, the date upon which Anton acquired Schick's and Carter's interests in the partnership, and at January 1, 1918. Their nineteen-thirtieths interest in the partnership tangibles was, therefore, on that date $37,084.15. Anton paid Schick $31,500 for a nine-thirtieths interest and Carter $40,000, of which $35,000 was for his interest in the partnership assets and $5,000 for his interest in the Canadian patent. Anton paid Schick and Carter $31,500 plus $35,000 cash for their interests in the partnership, a total of $66,500. This amount is $29,415.85 in excess of their pro rata shares of partnership tangibles at January 1, 1918. In addition, Anton agreed to pay all liabilities of the partnership, including the excess-profits tax liability for 1917, which proved to be $7,746. Since Schick and Carter were liable for nineteen-thirtieths of this amount of tax, their nineteen-thirtieths interest in the partnership intangibles at November 8, 1917, was sold for $34,321.95, and, upon the basis of that sale, the total value of such intangibles was $54,192.08. The partnership composed of Anton and Stoneback acquired these intangibles plus the one-half interest of Carter in the Canadian patent, which had a value of $5,000. The total value of the intangibles of the partnership paid in to the corporation by the partnership was, therefore, by this computation, $59,192.08.

The taxpayer claims the right to include in invested capital in respect of these intangibles a greater amount than has been allowed by the Commissioner by reason of the fact that the intangibles had a greater cash value. We do not, however, perceive any error committed by the Commissioner upon this point. He has applied the 25 per cent limitation imposed by section 326 (a) (5) of the Revenue Act of 1918, and has permitted the inclusion in invested capital of the greatest amount possible.

2. The taxpayer further claims that it is entitled to an increase in invested capital over the amount allowed by the Commissioner by reason of the fact that on April 8, 1918, Anton, who was entitled to receive royalties from the taxpayer in respect of Anton

lateral arms manufactured and sold by it, relinquished the right (provided the value could be included in invested capital), and that the value of the right thus acquired by the corporation was " from $49,700 to $89,850 or a fair average cash value of $65,275." The claim of the taxpayer upon this point is an unusual one. The evidence is to the effect that the taxpayer desired to redeem its preferred stock at a rate of $10,000 per annum and was afraid that the profits from the business might not permit this to be done. Anton therefore waived his right for a season to receive royalties from the corporation. This was a property right of unquestioned value. The amount which would have been paid by the taxpayer to Anton during 1918, if he had not waived his right to receive royalties, was $3,529.50 and the average amount which he would have received during the next few years was in excess of that amount. Although of unquestioned value, may that value be included in invested capital?

Section 331 of the Revenue Act of 1918 provides that in the case of the change of ownership of property, after March 3, 1917, if an interest or control in such property of 50 per cent or more remains in the same persons, or any of them, then the property received from the previous owner shall not, for the purpose of determining invested capital, be allowed a greater value than would have been allowed under Title III of the Revenue Act of 1918 in computing invested capital of such previous owner if the property had not been so transferred, and that, if the previous owner was not a corporation, then the value of the property so transferred shall be taken at its cost at date of acquisition. The evidence does not show that Anton paid anything for this right to receive a royalty. He was an owner of more than 90 per cent of the outstanding stock of the corporation at the date when he waived his right to receive royalties. After the waiver of such right to the corporation, he unquestionably still had more than a 50 per cent interest in the right waived. Section 331 is a complete bar to the claim of the taxpayer upon this point.

3. The Commissioner has determined that the taxpayer is entitled to deduct from gross income of the year 1918, $3,721.84 for exhaustion of the taxpayer's rights in the United States and Canadian patents on Anton lateral arms. This deduction is based upon a determination by the Commissioner of a value for those rights of $38,232.05. The taxpayer claims that in his determination of the value of such rights the Commissioner has not taken into account the value of Anton's and Stoneback's original eleven-thirtieths interest in them. It is the taxpayer's contention that the interests of the last two individuals were worth $19,239.60, and that therefore the basis which should be used for determining the depreciation allow-

ance upon such rights in the patents acquired from the previous partnership is $57,471.65.

The taxpayer also contends that it is entitled to deduct an additional $250, representing exhaustion on $2,500, the cash payment made by it on May 9, 1918, for Anton's·interest in the shop rights of the Canadian patent. Upon this last point the Commissioner admits error if it be found that the taxpayer is entitled to deduct any amount whatever in respect of the exhaustion of such shop right.

The taxpayer and the Commissioner have assumed that the amount paid by Anton for Schick's and Carter's interests in the partnership which terminated on November 8, 1917, in excess of their pro rata shares of the tangible assets, represents the amount paid for their rights in the United States and Canadian patents. In other words, they have assumed that the only intangible of value possessed by the partnership was its right in the United States patent on Anton lateral arms.

We think that the taxpayer's contention upon this point is not well founded. The Topeka Tent & Awning Co. had been in existence as a partnership for many years and had done a large business with awning manufacturers throughout the United States. The sales of Anton lateral arms prior to 1918 were only about one-third of the total sales of the concern. In its brief the taxpayer claims that the net profits on arms and the total net profits for the years 1910 to 1923, inclusive, were as follows:

| Year | Net profits on arms | Total net profits | Year | Net profits on arms | Total net profits |
|------|------|------|------|------|------|
| 1910 | $2,137.40 | $9,794.36 | 1917 | $11,848.65 | $25,484.79 |
| 1911 | 4,004.55 | 6,006.62 | 1918 | 7,396.95 | 4,804.55 |
| 1912 | 6,098.84 | 14,370.85 | 1919 | 11,764.50 | 28,032.22 |
| 1913 | 9,444.60 | 17,857.68 | 1920 | 16,945.50 | 22,940.70 |
| 1914 | 7,883.70 | 6,708.60 | 1921 | 12,333.85 | 13,766.53 |
| 1915 | 8,768.10 | 18,010.79 | 1922 | 17,171.55 | 31,087.90 |
| 1916 | 13,308.90 | 28,373.89 | 1923 | 21,834.45 | 35,316.18 |

The taxpayer did not keep books of account which showed net profits on sales of arms separately from the total net profits, and we can make no finding that the profits on the sales of lateral arms were what they are claimed to have been. But even upon the assumption that the figures presented by the taxpayer are correct, it appears that only about one-half of the net profits of the concern are attributable to such sales. The partnership was doing a profitable business even prior to the date of the issuance of the United States patent on Anton lateral arms. The good will of the partnership was undoubtedly valuable. It is not subject to an exhaustion deduction under the provisions of the Revenue Act of 1918. The Commissioner found that the fair value of the rights in the United States and Canadian patents possessed by the partnership, which was dis-

solved on November 8, 1917, plus the corporation's one-half interest in the license of the Canadian patent, all of which patent rights became property of the partnership composed of Anton and Stoneback and which were turned in to the corporation, had a value at January 1, 1918, of $38,232.05. No evidence has been adduced before us which proves that the cash value was in excess of that amount.

With respect to the computation of the exhaustion allowance based upon a value of $38,232.05, the taxpayer alleges that the correct amount of that exhaustion deduction is $3,823.20. This is based upon the assumption that the patents from which the rights issued had a life of 10 years from January 1, 1918. The facts are, however, that the United States patent had a life of 10 years, 2 months, and 7 days from that date and the Canadian patent an even longer life. No evidence is before us which proves that the Commissioner's computation of the exhaustion allowance with respect to the patent rights acquired from the predecessor partnership is in error.

The Commissioner admits that he made no deduction from gross income of the year 1919 of any amount representing an exhaustion of any part of the $2,500 paid by the taxpayer on May 9, 1918, for Anton's one-half interest in the shop right in the Canadian patent. He also admits that the taxpayer may be entitled to a deduction for the exhaustion of this interest in the patent. The appeal of the taxpayer upon this point is therefore sustained.

4. By the agreement between Anton and the taxpayer, dated April 8, 1918, Anton waived his right to receive a royalty of 50 cents on each lateral arm sold by the taxpayer. Had it not been for this agreement, the taxpayer would have paid Anton royalties of $3,529.50 for the year 1919 and even larger amounts for subsequent years. The taxpayer contends that Anton's right to receive royalties, if the value of the right may not be included in invested capital for the year 1919, is revived and that the taxpayer under its contract with Anton owes him the $3,529.50 in question, and that such amount is a legal deduction from the taxpayer's gross income for the year 1919.

We are of the opinion that there is no merit in this contention. The language of the agreement of April 8, 1918, is ambiguous. Even though the corporation be liable to Anton for the payment of any royalties in respect of lateral arms sold during the year 1919, such liability accrued not during the year 1919 but at some later date, when it was determined by the taxing authorities that the claim of the taxpayer with respect to the inclusion in invested capital of the value of the so-called gift to the taxpayer should be denied. Our conclusion is that the taxpayer is not entitled to deduct or exclude from the gross income of 1919 any amount in respect of royalties for that year.

5. The taxpayer claimed that, by reason of abnormalities in income and invested capital for the year 1919, it is entitled to special consideration under the provisions of section 328 of the Revenue Act of 1918. In our opinion, there were abnormalities, both of income and of invested capital, which entitle the taxpayer to such consideration. The taxpayer has not submitted any evidence as to comparatives. By reason of such failure, the determination of the Commissioner under the provisions of section 328 will be final. *Appeal of H. T. Cushman Manufacturing Co.*, 2 B. T. A. 39.

6. The taxpayer has alleged error on the part of the Commissioner in rejecting a claim for credit of $119.63, originally claimed for 1919. It has, however, offered no evidence in support of its claim.